IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| AET INC. LIMITED, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. G-06-487 |
| § | |
| C5 COMMUNICATIONS, LLC, § | |
| § | |
| Defendant. § | |

**ORDER DENYING DEFENDANT'S MOTION TO RECONSIDER DEFENDANT'S MOTION TO DISMISS, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff AET Inc. Limited ("AET") brings this action against Defendant C5 Communications LLC ("C5") requesting the Court to declare that the maritime liens asserted by C5 are null, void, and unenforceable. C5 filed a Motion to Dismiss, Stay, or Transfer, which this Court denied. C5 then filed a Motion to Reconsider Defendant's Motion to Dismiss, Stay, or Transfer. AET filed a timely Response, and C5 filed a Reply. In addition, AET and C5 each filed a Motion for Summary Judgment. Each Party filed timely Responses. For the reasons stated below, all of the aforementioned Motions are respectfully **DENIED**.[1]

**I. Background**

C5 provided AET with satellite communications equipment and services for its vessels in accordance with a Master Services Agreement (MSA), which bears the signatures of officials from both companies. AET claims that the MSA was procured by fraudulent acts and misrepresentations

---

[1]The Court does not consider this Order worthy of publication. Accordingly, it has not requested and does not authorize publication.

1

and, in fact, alleges that the person whose signature appears on the MSA, Kath Rooney ("Rooney"), may not have signed it or authorized her electronic signature to be used. C5 asserts that the individual who placed Rooney's electronic signature on the MSA, Eric Smith ("Smith"), was authorized to do so.

After paying several C5 invoices and using the satellite communication systems, AET alleges that it found out about C5's allegedly fraudulent activities and notified C5 that it was cancelling the MSA in accordance with the terms contained therein. The MSA contains terms for termination of the contract, and different terms apply depending upon whether AET or C5 is the Party in default. AET alleges that C5 is in default, and C5 alleges that AET is in default.

C5 filed a Demand for Arbitration to settle the dispute because the MSA has an arbitration clause. C5 also filed Notices of Claims of Maritime Liens against fifteen of AET's vessels. AET then filed this case, requesting a declaration from this Court that the maritime liens asserted by C5 be declared null and void. C5 responded by filing a Motion to Dismiss, Stay, or Transfer, which asserted that the matter was properly before an Arbitration panel according to the terms of the MSA. This Court issued an Order denying C5's Motion because a question of fact remained regarding the existence of a contract, which, according to Fifth Circuit precedent, calls into question whether the arbitration clause should be enforced. Now, C5 requests that the Court reconsider its Order. Additionally, both Parties move for summary judgment.

**II. Motion to Reconsider**

*A. Legal Standard*

Motions for reconsideration of a District Court's judgment may be filed under either Rule 59(e) or Rule 60(b). *See Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 353 (5th Cir. 1993). If

the motion is filed within ten days of judgment, it is considered a motion to alter or amend under Rule 59(e). *See id.* Otherwise, the party requesting reconsideration of a judgment must meet the requirements of Rule 60(b). *See id.* The Rule 60(b) motion must be made "within a reasonable time." Fed. R. Civ. P. 60(b). Under Rule 60(b), the district court may

> relieve a party . . . from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of judgment.

*Id.* A district court's denial of a Motion for Reconsideration is reviewed under an abuse of discretion standard and, thus, "need only be reasonable." *Edward H. Bohlin Co.*, 6 F.3d at 353.

*B. Analysis*

C5 urges the Court to reconsider its Order denying C5's Motion to Dismiss, Stay, or Transfer because, according to C5, the Court's Order was "NOT correct." (Resp. to Pl.'s Reply at 4 (emphasis in original).) C5 first argues that the Court should reconsider its prior Oder under Rule 60(b)(3). C5 claims that AET committed a fraud upon the Court when it claimed that the signature on the MSA may have been forged. C5 complains that "AET has not proved a defective Arbitration clause and the Court, without any specific evidence to the contrary, 'believed' AET's 'suggestion' of forgery." (Resp. to Pl.'s Reply at 5.) The Court did not hold that the MSA was forged in its prior Order. It merely held that there was a question of fact regarding the validity of the arbitration clause and specifically noted that there is a possibility that the electronic signature on the Agreement was not

authorized.[2]  The Parties do not dispute that C5's owner's son, Eric Smith, who was employed by AET, inserted Rooney's electronic signature upon the MSA.  And, the Record contains an email addressed to Smith that contains Rooney's electronic signature.  C5 claims that the email is evidence that Smith was authorized to insert Rooney's signature on the MSA.  However, there are no instructions on the email regarding why Rooney's electronic signatures were sent to Smith.  The email could just as easily be interpreted as evidencing that Smith had *access* to Rooney's signature and could thus fraudulently endorse the MSA, as AET alleges.  The evidence presented by both Parties leaves open a *question of fact* regarding whether Rooney authorized the use of the electronic signature.  Thus, C5 has failed to show that AET's "suggestion of forgery" was fraudulent, and the requirements under Rule 60(b)(3) have not been met.

C5's other arguments for reconsideration rely on Rule 60(b)(1).  In the Fifth Circuit, Rule 60(b)(1) "may be invoked for the correction of judicial error, but only to rectify an obvious error of law, apparent on the record." *Hill v. McDermott, Inc.*, 827 F.2d 1040, 1043 (5th Cir. 1987).  C5 argues that a contract between C5 and AET exists as a matter of law because offer, acceptance, and consideration are present, and, as such, whether or not the signature on the MSA was forged is irrelevant.  C5 also questions whether a signature is required because, according to C5, AET ratified the contract with its subsequent actions.  However, even if a contract arose as a matter of law,[3] the alleged forgery is relevant as to whether the Parties had a "*written* agreement for arbitration."

---

[2]The Court hereby incorporates its prior Order into this Order.

[3]As is noted in the Summary Judgment section below, while the Record contains evidence of performance on both sides, neither Party has hashed out their claims well enough for dispositive relief on the issue, and the Court is making no determinations at this time regarding whether a legal contract arose.

9 U.S.C. § 4 (2000) (emphasis added); *see also Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 219 (5th Cir. 2003) (agreeing with other circuits that "the court must first determine if there is an agreement to arbitrate before any additional dispute can be sent to arbitration" if there are "claims that a signature is forged or the agent lacked authority to bind the principle").

C5 additionally argues that, even if AET did not authorize the electronic signature, the Court must enforce the arbitration provision because, under Texas law, a nonsignatory is bound by an arbitration agreement when the nonsignatory sues on the contract containing the arbitration provision, or when the nonsignatory is a third-party beneficiary to a contract with an arbitration provision. C5 cites *Fleetwood Enterprises, Inc. v. Gaskamp* for this contention. *See Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069 (5th Cir. 2002). In *Fleetwood Enterprises*, the Fifth Circuit considered whether children of the signatories of a contract for the purchase of a mobile home were bound by the arbitration clause in said contract. *See id.* at 1074–77. The children were suing in tort, and they were not third-party beneficiaries of the contract. *See id.* The Fifth Circuit discussed Texas cases that have held (1) that a nonsignatory to a contract is bound to the terms of the contract if the nonsignatory sues on the contract; and (2) that a nonsignatory is bound by an arbitration agreement if the nonsignatory is a third-party beneficiary to the contract. *See id.* (collecting cases). C5 fails to explain the relevancy of *Fleetwood Enterprises* to the instant case. If C5 is contending that AET is bound by the arbitration provision in the MSA because AET is suing on the contract, the facts and caselaw that have been presented to the Court do not support C5's contention. AET is seeking a declaratory judgment regarding the value of the liens that C5 asserted against AET's vessels, and AET is claiming, essentially, that it did not sign the contract under which C5 is asserting the liens. AET is not seeking to benefit from the terms of the contract. *Cf. Southwest Tex. Pathology Ass., L.L.P. v.*

*Roosth*, 27 S.W.3d 204, 208 (Tex. App.–San Antonio, 2000) ("A nonsignatory can only be bound by the terms of an arbitration provision in an agreement if the nonsignatory is asserting claims that require reliance on the terms of the written agreement containing the arbitration provision.").

If C5 is asserting that AET is the third-party beneficiary of the MSA, then "the intent to make someone a third-party beneficiary must be clearly written or evidenced in the contract." *Id.* at 1076. C5 has not pointed to any language in the MSA that indicates AET is the third-party beneficiary of the contract. Thus, while *Fleetwood Enterprises* is on point because the Fifth Circuit held that the nonsignatories were not bound to the arbitration clause because they were not suing on the contract or third-party beneficiaries, it does not support C5's contention that AET should be bound by the arbitration clause in the MSA.

C5's final contention in its Motion to Reconsider is that AET is judicially estopped from arguing the existence of a contract because AET (1) claims it cancelled the MSA in accordance with the terms contained in the contract; and (2) has sued in other courts based on the fact that a contract exists. The requirements for a judicial estoppel claim in the Fifth Circuit are as follows:

> (1) the party is judicially estopped only if its position is clearly inconsistent with the previous one; (2) the court must have accepted the previous position; and (3) the non-disclosure must not have been inadvertent.

*In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004). C5 has not satisfied the elements of this test for either of its judicial estoppel contentions. The contention that AET is estopped from claiming the contract does not exist due to its allegation in the instant case that it cancelled the contract in accordance with the terms contained therein fails because this Court has not accepted AET's claim that it cancelled the contract. Conversely, the Court has held that a question of fact remains regarding the contract's existence. Thus, the second prong is not met.

As evidence for the estoppel claim based on the proceedings in another court, C5 offers pleadings in the other matter in which AET discusses the MSA. In its Complaint in the other matter, AET states that the "contract was executed" on August 3, 2005. (Def.'s Mot. to Recons. Ex.. G, ¶30.) However, AET does not take a position "clearly inconsistent" with the position it takes here because AET qualifies its statements about the MSA's execution by (1) noting that "Eric Smith, who had signatures of many officers at AET on his computer, may have entered electronic signature on the contract without the authority of AET" (Def.'s Mot. to Recons. Ex. G, n.1.); and (2) referring to the MSA as an "alleged contract" (Def.'s Mot. to Recons. Ex. G, ¶ 27.). Furthermore, even if AET had taken a position "clearly inconsistent" with the position it takes here, there is no evidence that the other court accepted the MSA as a valid contract. Thus, the second prong is not satisfied, and AET is not, at this point, judicially estopped from asserting that Rooney's electronic signature was not authorized.

C5's arguments that the Court's former Order was "NOT correct" are not persuasive and certainly do not rise to the level of an "obvious error of law." *Hill*, 827 F.2d at 1043; *see also* Rule 60(b)(1). Also, C5 has failed to present sufficient evidence that the Court should reconsider it prior Order due to AET's alleged fraudulent misrepresentations to the Court. *See* Rule 60(b)(3). Thus, C5's Motion for Reconsideration is **DENIED**.

**III. Motions for Summary Judgment**

*A. Legal Standard*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552–53, 91 L. Ed. 2d 265 (1956). The party moving

for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[4] *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must come forward with "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). The court must view all evidence in the light most favorable to the non-movant. *See, e.g.*, *Broussard v. Parish of Orleans*, 318 F.3d 644, 650 (5th Cir. 2003).

If the evidence would permit a reasonable fact finder to find in favor of the non-moving party, summary judgment should not be granted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S. Ct. at 2512. Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See id.* at 255, 106 S. Ct. at 2513.

B. Analysis

Both Parties claim they have grounds for summary judgment. AET claims that the maritime liens asserted by C5 are worthless because the satellite communications systems that C5 provided were not "necessary" under the Maritime Lien Act. C5 claims the systems were necessary and that, as such, the maritime liens it asserts arose as a matter of law. Thus, according to C5, it is entitled to

---

[4]However, if the moving party "bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

summary judgment. C5 also asserts that summary judgment in its favor is appropriate because the MSA, even if not authorized, was subsequently ratified by AET's actions.

   *1. Necessaries*

Under the Commercial Instruments and Maritime Lien Act, "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel." 46 U.S.C. § 31342(a)(1). The term "necessaries" includes "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). "[M]ost goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function" are considered "necessaries." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986). The "term refers to what is reasonably needed in the ship's business," and "does not mean absolutely indispensable." 1 Thomas J. Schoenbaum, Admiralty and Maritime Law 530 (4th ed. 2004).

C5 argues that the satellite communication systems it provided to AET's vessels were necessaries, and AET argues that the systems were luxuries. AET claims that it already had working communication systems on its vessels, including a satellite system, and that it only wanted C5's satellite systems as a supplement to its existing equipment. C5 claims that AET's old systems are archaic, slow, and expensive, and implies that the more modern systems it supplies are "reasonably needed in the ship's business." *Id.* If left to determine based on the current facts, the Court tends to agree with AET that the new systems may not be necessary. However, because the term "necessaries" is "broadly construed," *id.*, further discovery is required to rule out the possibility that the systems are necessary.

   *2. Executory Contract Doctrine*

AET next claims that C5 cannot assert a maritime lien because the services for which C5 is

claiming a lien were not performed. Under the Executory Contract Doctrine, "no lien attaches for the breach of an executory contract." *Bunn v. Global Marine, Inc.*, 428 F.2d 40, 48 n.10 (5th Cir. 1970). AET contends that the alleged contract was still executory because C5 had not fully performed its duties. C5 claims that it supplied all or substantially all of the contracted for equipment and services by the time of AET's alleged breach.

The Parties have not indicated whether they are asserting that the satellite communication systems should be considered cargo, repairs, or services. In cargo contracts, delivery of only part of the cargo is insufficient to create a maritime lien. *See e.g.*, *Osaka Shosen Kaisha v. Pac. Exp. Lumber Co.*, 260 U.S. 490, 500, 43 S. Ct. 172, 174, 67 L. Ed. 364 (1923) ("The theory that partial acceptance of the designated cargo under a contract of affreightment creates a privilege of lien upon the ship for damages resulting from failure to take all, is inconsistent with the opinions of this court and . . . without support of adequate authority."); *The Keokuk*, 76 U.S. (9 Wall.) 517, 519, 19 L. Ed. 744 (1869) ("[T]he law creates no lien on a vessel as a security for the performance of a contract to transport a cargo until . . . the cargo to which it relates has been delivered to the custody of the master or someone authorized to receive it."). If, however, all the cargo is delivered, then the contract is no longer executory. *See The Keokuk*, 76 U.S. (9 Wall.) at 510. But, regardless of whether the contract is executory, the cargo must be delivered to a specific vessel for the contract to be considered a maritime contract. *See Jones v. Berwick Bay Oil Co.*, 697 F. Supp. 260, 266–67 (E.D. La. 1988) (collecting cases that "recognize that whether supplies are delivered to a specified vessel as opposed to a fleet of vessels affects the law governing the contract," and requiring delivery to a specified vessel for admiralty jurisdiction to lie). A maritime lien will only attach if the breached contract is a maritime contract.

In the instant case, if the Court were to consider the systems cargo, then questions of fact remain regarding its delivery and installation. C5 claims that it delivered all of the equipment and that it loaded and commissioned the systems on fourteen of the fifteen AET vessels scheduled to be commissioned in the first phase of the project. (Def.'s Mot. Summ. J. 13.)  It appears that, at least currently, the equipment is in a warehouse, not on the vessels. (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. E-9.)  The MSA requires C5 to install the systems, (Pl.'s Mot. Summ. J. Ex. 1, ¶ 3(c)), and the Quality of Service Agreement requires C5 to monitor and manage the systems "utilizing C5's state-of-the-art Network Operations Centers (NOC's), each of which are staffed by personnel 24 hours a day, 365 days a year," (Pl.'s Mot. Summ. J. Ex. 2(G).)  AET is no longer using the systems, so it is clear that C5 is no longer providing this service.

A more reasonable interpretation of the nature of the contract is that the MSA provides for a combination of repairs and services.  As discussed above, the service portion of the MSA requires C5 to provide continuous monitoring and management of the systems.  The attachments to the MSA indicate that C5 agreed to provide these services for a minimum of five years. (Pl.'s Mot. Summ. J. Ex. 1, Schedule A.)  Thus, the MSA can be compared to a contract to provide all the fuel a vessel needs for a certain period of time.  In *Garcia v. Warner, Quinlan Co.*, the Southern District of New York determined that it could not exercise admiralty jurisdiction in a claim for breach of a contract to sell a steamship company all its fuel requirements for one year. *See Garcia v. Warner, Quinlan Co.*, 9 F. Supp. 1010, 1011 (S.D.N.Y. 1934).  The court reasoned that the contract was "not a maritime contract as to any part that remains executory." *Id.* (citing *S.S. Overdale Co. v. Turner*, 206 F. 339 (E.D. Pa. 1913) (refusing to exercise admiralty jurisdiction in a case for breach of a requirements contract for coal)); *see also Jones v. Berwick Bay Oil Co.*, 697 F. Supp. 260, 267 (E.D. La. 1988)

("[A] blanket contract to supply fuel for use by a fleet of vessels engaged in maritime activity is not a maritime contract as to any part that remains executory. However, once fuel is supplied to a particular vessel, the purchase order contract becomes executed as to that delivery."). Thus, in the instant case, any *services* that C5 has not provided remain executory and are thus nonmaritime.

If the satellite communication systems are considered a "repair," then a maritime lien cannot be asserted if the repairs have not yet been performed. *See The Yankee*, 37 F. Supp. 512, 514 (D.C.N.Y. 1941) (regarding a contract for repairs to a vessel that was never delivered to the repairer as "an executory contract to render a maritime service" and determining that "in the absence of even part performance, the admiralty jurisdiction cannot be invoked even in personam"). C5 claims it installed fourteen out of fifteen systems. So, based solely on that information, it would appear a maritime lien arose for the fourteen systems that were commissioned. However, the Record is abound with factual distinctions regarding the systems that were installed and the services that were provided. Thus, the case is not yet ripe for dispositive relief under the Executory Contract Doctrine.

*3. Ratification*

C5's final claim is that it is entitled to summary judgment because, even if AET did not execute the MSA, it ratified the MSA when its agent accepted delivery of the equipment. Though there is suggestion from both sides of performance, it is not sufficiently determined to subject the case to dispositive relief. Furthermore, since the case before this Court hinges on whether C5's maritime liens have value, the case is not purely contractual. Thus, even if the contract were ratified, if the executory portion cannot be considered a maritime contract, then the *maritime* liens have no value.

In sum, because questions of fact remain regarding whether a maritime lien arose under the Commercial Instruments and Maritime Lien Act, both Motions for Summary Judgment are

**DENIED**.[5]

### IV. Conclusions

For the reasons stated above, C5's Motion to Reconsider is **DENIED**. Additionally, AET's Motion for Summary Judgment and C5's Motion for Summary Judgment are **DENIED**. Each Party is to bear its own taxable costs, expenses, and attorney's fees incurred herein to date.

**IT IS SO ORDERED**.

**DONE** this 14th day of February, 2007, at Galveston, Texas.

_____
Samuel B. Kent
United States District Judge

---

[5] Although there is not sufficient evidence in the Record to grant dispositive relief at this time, the Court, through its review of the evidence before it, wholeheartedly believes that the Parties can reach an amicable resolution of this matter on their own.